# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| APARTMENT MANAGEMENT CONSULTANTS, LLC, | No. 60254-7-II |
| Appellant, | |
| v. | |
| STATE OF WASHINGTON, DEPARTMENT OF REVENUE, | ORDER GRANTING MOTION TO PUBLISH AND PUBLISHING OPINION |
| Respondent. | |

Respondent, the Department of Revenue, filed a motion to publish this court's opinion filed on November 12, 2025. The appellant, Apartment Management Consultants, LLC, responded. After consideration, the court grants the motion. It is now

**ORDERED** that the final paragraph in the opinion which reads "A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record pursuant to RCW 2.06.040, it is so ordered." is deleted. It is further

**ORDERED** that the opinion will now be published.

**FOR THE COURT**

**PANEL**: Jj. Lee, Glasgow, Che

LEE, JUDGE

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| APARTMENT MANAGEMENT CONSULTANTS, LLC, | No. 60254-7-II |
| Appellant, | |
| v. | |
| STATE OF WASHINGTON, DEPARTMENT OF REVENUE, | UNPUBLISHED OPINION |
| Respondent. | |

LEE, P.J. — Apartment Management Consultants, LLC (AMC), a property management company, brought an action against the Department of Revenue (Department) for a refund of business and occupation (B&O) tax paid on labor expenses—specifically, wages paid—for certain employees. AMC appeals the superior court's order denying its motion for summary judgment and granting summary judgment in favor of the Department based on the court's determination that the wages paid to the employees at issue constituted AMC's gross income under RCW 82.04.080(1), making it subject to B&O tax. AMC argues that it was not the employer of those employees, so the wage payments do not constitute AMC's labor expenses within the statutory definition of gross income. Alternatively, AMC asserts the payments should have been excluded from AMC's gross income under WAC 458-20-111 (Rule 111). AMC also contends that the

Department has improperly imputed income to AMC and that the imputation of income is a violation of due process.

Because the parties do not dispute any issues of material fact, and because the record shows that AMC is the employer, we hold that the wages AMC paid to employees from the operating account constituted "value proceeding or accruing by reason of the transaction of the business engaged in," and were properly included within AMC's gross income. RCW 82.04.080(1). Also, because AMC failed to establish that it acted as an agent of the property owners in making the wage payments, Rule 111 does not apply. Finally, because the wages are "value proceeding or accruing by reason of the transaction of the business engaged in," we hold that the Department did not improperly impute income and there is no due process violation. Therefore, the superior court did not err when it denied AMC's motion for summary judgment and granted summary judgment in favor of the Department. We affirm the superior court.

FACTS

A.    BACKGROUND

AMC is a property management company that provides comprehensive services to owners (Owners) of multifamily housing. Those services include "budgeting, leasing, marketing, and managing the different operational aspects" of a property, often referred to as a "'Project.'" Clerk's Papers (CP) at 16. AMC's services also include "hiring, supervising, discharging, and compensating workers on the [Owners'] property," known as onsite employees or Project employees. CP at 3.

No. 60254-7-II

 1. AMC's Property Management Agreement

AMC enters into property management agreements (PMAs) with Owners, wherein Owners engage AMC as the exclusive property manager of a Project. The PMAs set forth the obligations between Owners and AMC.

Under the terms of the PMA, Owners will create a budget and business plan, which guides AMC's management of a property. AMC establishes two types of bank accounts for each property: an operating account and a trust account. AMC deposits "all security and other refundable deposits made by tenants" into the trust accounts. CP at 359. All other funds, such as tenant rents collected, are placed in an operating account.

AMC is authorized to pay for "all expenses and costs of operating [a] Project" from the operating account, including its own management fee. CP at 360. AMC's management fee is 2.5 percent per month of a Project's "monthly total effective gross income." CP at 366.

The PMA provides for the expenses that AMC must pay from the operating account:

> 4.3 SPECIFIC EXPENSES TO BE PAID BY MANAGER: [AMC] shall pay from the Project operating account . . . all utility and maintenance charges; all real property taxes and assessments; all premiums for liability and property insurance; all monthly payments upon underlying secured real property debt; [AMC's] fees; all other operating and rental expenses set forth herein and as may be necessary for the continued operation of the Project; employee salaries, wages, and related employee expenses; the costs and expense of uniforms for employees (if applicable); legal fees related to the operation of the Project; the costs and expenses directly associated with the training of Project employees; and such other expenses as contemplated by the [business plan] or as stated in this agreement.

CP at 360. After the Project costs have been paid, AMC transmits the net cash, except for a cash contingency reserve, to the Owner on at least a monthly basis.

Regarding onsite employees, the PMA provides:

3

       8.1    MANAGER'S AUTHORITY TO HIRE: [AMC] is authorized to hire, supervise, discharge and pay all servants, employees, contractors or other personnel necessary to be employed in the management, maintenance and operation of the Project so long as all payroll and related expenditures for such personnel are within the [business plan] guidelines. All employees performing services directly for the Project (excluding off-site property manager) shall be deemed to be employees of [AMC] and the Project. When requested by Owner, [AMC] shall consult with Owner in decisions relating to the hiring, promotion and termination of Project employees. Owner or its representatives will not interfere with or direct any of [AMC's] employees.

       8.2    OWNER TO REIMBURSE EMPLOYEE EXPENSES: All wages, fringe benefits, and all other forms of compensation payable to, or for the benefit of, employees of the Project . . . and all local, state and federal taxes and assessments . . . incident to the employment of all such personnel, shall be treated as an operating expense of the Project and shall be paid by [AMC] from Owner's funds, from the Project operating account subject to the [business plan]. . . .

       8.3    MANAGER'S AUTHORITY TO FILE RETURNS: [AMC] shall do and perform all acts required of an employer with respect to the Project and shall execute and file all tax and other returns required under the applicable federal, state and local laws, regulations and/or ordinances governing employment, and all other statements and reports pertaining to labor employed in connection with the Project and under any similar federal or state law now or hereafter in force. In connection with such filings, Owner shall, upon request, promptly execute and deliver to [AMC] all necessary powers of attorney, notices of appointment and the like. Owner shall be responsible for all amounts required to be paid under the foregoing laws, and [AMC] shall pay the same from the operating account.

CP at 362.

       The PMA also states that AMC acts as an independent contractor and that AMC "shall act in a fiduciary capacity" with respect to the Owners' interests and assets. CP at 363. Additionally, "[e]xcept as provided herein, neither party shall have the power to bind or obligate the other party and [AMC] shall not have any rights, duties, powers or obligations except those expressly set forth in this agreement." CP at 363. Further, the PMA provides: "Except as specifically set forth in this

4

Agreement, [AMC] shall not act as the agent of Owner; and except as provided in this Agreement, Owner shall not act as the principal of [AMC]." CP at 363.

2.     AMC's Employee Structure and Hiring

Within AMC, regional property managers[1] manage portfolios of multiple properties. The regional managers generally work at AMC headquarters, a regional office, or remotely. The regional managers oversee individual property managers, who run the day-to-day operations at an individual property. AMC distinguishes between "corporate employees"—regional managers and those above the regional manager position—and "onsite employees" or those who work at a specific property. CP at 133. Corporate employee salaries are paid from the 2.5 percent management fee AMC collects from the Owners. Onsite employee salaries are "an expense of the property itself," paid from the property's operating account. CP at 133.

AMC recruits, hires, and staffs onsite employees for the properties it manages. AMC's human resources department writes job descriptions for onsite positions, which list AMC as the employer. While the positions are property-specific, the descriptions do not list the actual property where the employee would work. Positions include "Maintenance Technician," "Leasing Agent," "Boat Dock Manager," and "Activities Director," among others. CP at 396, 398, 474, 480. Onsite employees receive and sign an "Acknowledgment for Receipt of Job Description." CP at 412. If an AMC client purchases a property with existing employees, AMC "step[s] in" and "consider[s]

---

[1] Regional property managers are overseen by a vice president of operations and senior vice president of operations.

5

the employees that are already there that are familiar with the property." CP at 151. AMC will recruit the existing employees to become AMC employees.

In addition to the PMAs, the AMC Employee Handbook governs the relationship between AMC and the onsite employees. All employees must sign and return to AMC an "Acknowledgment and Receipt of Employee Handbook." CP at 471. In the handbook's opening paragraph, AMC states: "We hope that you will take pride in your employment with us and enjoy being a member of the AMC team." CP at 423. The handbook provides AMC's employment policies, including that "[e]mployment with AMC is intended to be, and is, at-will," and lists benefits that AMC provides to all employees, such as health, dental, and vision insurance, a 401(k) plan, and paid vacation time. CP at 430. The handbook also states:

> [E]mployees should be aware that in the course of their employment with AMC, the management contract of the specific property at which the employee works may be transferred by the property owners to a different property management entity other than AMC. In these cases, an employee may be laid off or transferred to another AMC-managed property where possible, though AMC has no obligation to find employment for any employee in such instances.

CP at 430.

Job offers are provided on AMC letterhead. The job offers all list positions "for" or "at" AMC at a particular property. CP at 474, 478. AMC is the employer of record for onsite employees,[2] pays onsite employees, and withholds the applicable taxes from onsite employee paychecks. AMC provides training and development for all onsite employees, along with annual performance evaluations.

---

[2] An "employer of record" "is the person who reports employees under its own UBI or EIN for state or federal tax, employment security, or insurance purposes." CP at 242.

Owners are not co-employers, nor is there a contract that exists between onsite employees and Owners.

B.      AUDIT AND APPEAL

In 2019, the Department initiated an audit for the tax period of January 1, 2015, through December 31, 2018.  In January 2020, the Department issued a tax assessment of $480,853.78 in B&O taxes, penalties, and interest based on AMC's exclusion of "income related to the payroll for AMC's onsite employees" from its gross income.  CP at 262.

AMC had paid Washington's B&O tax on the management fee it received for its services.[3] However, AMC maintained that the payments to its onsite employees were non-taxable reimbursements that should be excluded from its gross income—and B&O tax liability calculation—under Rule 111.[4,5]  The Department determined that AMC did not qualify under Rule 111 and disallowed the exclusion.

AMC appealed the assessment to the Department's Administrative Review and Hearings Division.  The Administrative Review and Hearings Division upheld the assessment.  AMC then sought reconsideration of the determination, which the Department denied.

---

[3]  AMC does not dispute the B&O tax paid on its management fee.

[4]  Rule 111 allows a taxpayer to exclude "from the measure of tax amounts representing money or credit received by a taxpayer as reimbursement of an advance in accordance with the regular and usual custom of his business or profession."  WAC 458-20-111.

[5]  AMC also claimed it qualified as a "Statutory Paymaster" under RCW 82.04.43393 and Excise Tax Advisory (ETA) 3196.2015 or a "PEO Paymaster" in accordance with ETA 3192.2014, thus allowing the payments to its onsite employees to be excluded.  CP at 262, 263.  AMC appears to have abandoned these theories on appeal because they do not raise them on appeal; thus, this opinion will not address them.

In October 2021, AMC paid the $481,442.36 tax assessment for the audit period. Subsequently, in June 2023, AMC filed an action in superior court seeking a refund for the tax assessment paid. AMC alleged that the amounts it paid to the onsite employees, whom they called Owners' employees, did not constitute "gross income" under RCW 82.04.080. CP at 7. AMC also alleged that the funds the Department taxed are monies that AMC paid only as an agent of the Owners and that AMC satisfied the requirements of Rule 111.

C.    CROSS MOTIONS FOR SUMMARY JUDGMENT

AMC filed a motion for summary judgment. AMC argued that the onsite employees were employees of the Owners so the funds AMC transferred from a project's operating account to pay onsite employee wages did not qualify as AMC's gross income. AMC also argued that Rule 111 applied to its circumstances because the PMAs established that AMC was an agent of the Owners.

Alternatively, AMC contended that a refund was appropriate because (1) "there was never a transfer of funds from the Owner to AMC" and (2) AMC provided only management services; it "did not agree to provide maintenance, lawn care, or other rental property services." CP at 25. Thus, according to AMC, the onsite employee wages were not compensation for rendition of services and did not fall within the definition of gross income found in RCW 82.04.080.[6] Finally,

---

[6] The definition of "'gross income of the business'" found in RCW 82.04.080(1) is

> the value proceeding or accruing by reason of the transaction of the business engaged in and includes gross proceeds of sales, compensation for the rendition of services, gains realized from trading in stocks, bonds, or other evidences of indebtedness, interest, discount, rents, royalties, fees, commissions, dividends, and other emoluments however designated, all without any deduction on account of the cost of tangible property sold, the cost of materials used, labor costs, interest,

8

AMC alleged "[a]llowing [the Department] to impute income, reject Rule 111 exclusion, or interpret RCW 82.04.080 to include funds owned by the Owner and over which AMC has no discretion or control likely violates . . . [the Fourteenth Amendment]." CP at 25.

The Department also filed a motion for summary judgment. The Department argued that (1) the payroll costs for onsite employees were part of AMC's gross income subject to B&O tax and (2) AMC was not entitled to exclude the payroll costs under Rule 111 because AMC could not meet the conditions of the rule.

After a hearing on the motions, the superior court determined that (1) there were no genuine issues of material fact, (2) AMC was the employer of the onsite employees, and (3) AMC did not pay the onsite employee wages in an agent capacity. The superior court concluded that the onsite employee wages were part of AMC's business gross income subject to B&O tax and not excludable under Rule 111. Accordingly, the superior court denied AMC's motion for summary judgment and granted summary judgment in favor of the Department.

AMC appeals.

## ANALYSIS

AMC argues that the superior court erred when it denied its motion for summary judgment and granted summary judgment in favor of the Department based on the conclusions that (1) AMC was the employer of the onsite employees, (2) the onsite employee wage payments taken from the operating fund were part of AMC's gross income, and (3) Rule 111 did not apply. In the

discount, delivery costs, taxes, or any other expense whatsoever paid or accrued and without any deduction on account of losses.

alternative, AMC asserts that the Department has improperly imputed income to AMC, which is a violation of due process. We disagree.

A.    STANDARD OF REVIEW

We review summary judgment decisions de novo. *Royal Oaks Country Club v. Dep't of Revenue*, 2 Wn.3d 562, 568, 541 P.3d 336 (2024). Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." CR 56(c). Here, the parties do not dispute any issues of material fact. Instead, the parties dispute the application of tax statutes and rules to the facts of this case. "When the issue is how a tax statute applies to the facts of a case, the reviewing court treats the issue as a question of law and reviews it de novo." *Royal Oaks*, 2 Wn.3d at 568; *see also Wash. Imaging Servs., LLC v. Dep't of Revenue*, 171 Wn.2d 548, 555, 252 P.3d 885 (2011).

B.    B&O TAX APPLIES

1.    Legal Principles

a.    Business and occupation tax

Washington levies a B&O tax "for the act or privilege of engaging in business activities" in the state. RCW 82.04.220(1). The B&O tax applies broadly and is imposed "'upon virtually all business activities carried on within [Washington].'" *Dynamic Res., Inc. v. Dep't of Revenue*, 21 Wn. App. 2d 814, 819, 508 P.3d 680 (2022) (internal quotation marks omitted) (quoting *Steven Klein v. Dep't of Revenue*, 183 Wn.2d 889, 896, 357 P.3d 59 (2015)).

B&O tax is calculated based on "the application of rates against value of products, gross proceeds of sales, or *gross income of the business*, as the case may be." RCW 82.04.220(1)

(emphasis added). "The business and occupation tax is not a tax on either profit or net gain or capital gain or sales, but a tax on the total money or money's worth received in the course of doing business." *Budget Rent-A-Car of Washington-Oregon, Inc. v. Dep't of Revenue*, 81 Wn.2d 171, 173, 500 P.2d 764 (1972); *Rho Co. v. Dep't of Revenue*, 113 Wn.2d 561, 566-67, 782 P.2d 986 (1989) (stating "as a general rule, the base amount from which the B&O tax is calculated does not allow for deductions for the expenses of conducting business"). Whether a profit is made is immaterial. *Budget Rent-A-Car*, 81 Wn.2d at 173.

Under RCW 82.04.080(1), "gross income of the business" is defined as:

> [T]he value proceeding or accruing by reason of the transaction of the business engaged in and includes gross proceeds of sales, compensation for the rendition of services, . . . all without any deduction on account of the cost of tangible property sold, the cost of materials used, labor costs, interest, discount, delivery costs, taxes, or any other expense whatsoever paid or accrued and without any deduction on account of losses.

*See also Wash. Imaging Servs.*, 171 Wn.2d at 555-56. The "value proceeding or accruing" is "the consideration, whether money, credits, rights, or other property expressed in terms of money, actually received or accrued." RCW 82.04.090. "Under this broad definition [of gross income], a service provider may not deduct any of its own costs of doing business, including its labor costs, from its gross income." *Pilcher v. Dep't of Revenue*, 112 Wn. App. 428, 436, 49 P.3d 947 (2002), *review denied*, 149 Wn.2d 1004 (2003).

Courts presume taxes are valid. *Irwin Nats. v. Dep't of Revenue*, 195 Wn. App. 788, 804, 382 P.3d 689 (2016), *review denied*, 187 Wn.2d 1017, *cert. denied*, 583 U.S. 871 (2017). A taxpayer seeking a refund of B&O taxes that it paid bears the burden of proving the Department incorrectly assessed the tax. *Wash. Imaging Servs.*, 171 Wn.2d at 555; *Protective Admin. Servs.,*

*Inc. v. Dep't of Revenue*, 24 Wn. App. 2d 319, 325, 519 P.3d 953 (2022) ("A taxpayer must prove that the tax paid was incorrect and prove the correct amount of tax in order to establish that they are entitled to a refund."); RCW 82.32.180. Whether a party is entitled to a tax refund is a question of law we review de novo. *Protective Admin. Servs.*, 24 Wn. App. 2d at 325.

      b.     Rule 111

WAC 458-20-111, known as Rule 111, excludes certain "'pass through'" payments from a taxpayer's gross income in cases when the taxpayer "assumes solely agent liability." *Rho*, 113 Wn.2d at 567; WAC 458-20-111. Rule 111 provides, in relevant part:

> The word "advance" as used herein, means money or credits received by a taxpayer from a customer or client with which the taxpayer is to pay costs or fees for the customer or client.

> The word "reimbursement" as used herein, means money or credits received from a customer or client to repay the taxpayer for money or credits expended by the taxpayer in payment of costs or fees for the client.

> The words "advance" and "reimbursement" apply only when the customer or client alone is liable for the payment of the fees or costs and when the taxpayer making the payment has no personal liability therefor, either primarily or secondarily, other than as agent for the customer or client.

> There may be excluded from the measure of tax amounts representing money or credit received by a taxpayer as reimbursement of an advance in accordance with the regular and usual custom of his business or profession.

> The foregoing is limited to cases wherein the taxpayer, as an incident to the business, undertakes, on behalf of the customer, guest or client, the payment of money, either upon an obligation owing by the customer, guest or client to a third person, or in procuring a service for the customer, guest or client which the taxpayer does not or cannot render and for which no liability attaches to the taxpayer. It does not apply to cases where the customer, guest or client makes advances to the taxpayer upon services to be rendered by the taxpayer or upon goods to be purchased by the taxpayer in carrying on the business in which the taxpayer engages.

. . . .

. . . [N]o charge which represents an advance payment on the purchase price of an article or a cost of doing or obtaining business, even though such charge is made as a separate item, will be construed as an advance or reimbursement. Money so received constitutes a part of gross sales or gross income of the business, as the case may be.

WAC 458-20-111.[7]

For Rule 111 to apply, three conditions must be met: "1) the payments are 'customary reimbursements for advances made to procure a service for the client'; 2) the payments 'involve services that the taxpayer did not or could not render'; and 3) the taxpayer 'is not liable for paying the associate firms except as the *agent* of the client.'" *Rho*, 113 Wn.2d at 567-68 (emphasis in

---

[7] WAC 458-20-111 also provides examples of "advance" and "reimbursement":

For example, where a taxpayer engaging in the business of selling automobiles at retail collects from a customer, in addition to the purchase price, an amount sufficient to pay the fees for automobile license, tax and registration of title, the amount so collected is not properly a part of the gross sales of the taxpayer but is merely an advance and should be excluded from gross proceeds of sales. Likewise, where an attorney pays filing fees or court costs in any litigation, such fees and costs are paid as agent for the client and should be excluded from the gross income of the attorney.

On the other hand, . . . no exclusion is allowed with respect to amounts received by (1) a doctor for furnishing medicine or drugs as a part of his treatment; (2) a dentist for furnishing gold, silver or other property in conjunction with his services; (3) a garage for furnishing parts in connection with repairs; (4) a manufacturer or contractor for materials purchased in his own name or in the name of his customer if the manufacturer or contractor is obligated to the vendor for the payment of the purchase price, regardless of whether the customer may also be so obligated; (5) any person engaging in a service business or in the business of installing or repairing tangible personal property for charges made separately for transportation or traveling expense.

original) (quoting *Christensen, O'Connor, Garrison & Havelka v. Dep't of Revenue*, 97 Wn.2d 764, 769, 649 P.2d 839 (1982)).

The primary inquiry is whether the taxpayer can establish the existence of an agency relationship. *City of Tacoma v. William Rogers Co.*, 148 Wn.2d 169, 177-78, 60 P.3d 79 (2002). "'An agency relationship generally arises when two parties consent that one shall act under the control of the other.'" *Wash. Imaging Servs.*, 171 Wn.2d at 562 (quoting *Rho*, 113 Wn.2d at 570). However, how the parties describe themselves in contract documents does not control the existence of an agency relationship; rather, an agency relationship depends on the particular facts and circumstances of each case. *Id.* at 563; *accord Rho*, 113 Wn.2d at 570 ("Determination of an agency relationship is not controlled by the manner in which the parties contractually describe their relationship.").

If the taxpayer can demonstrate an agency relationship, "a second condition must be satisfied—the taxpayer's liability to pay must constitute '*solely* agent liability.'" *Wash. Imaging Servs.*, 171 Wn.2d at 562 (emphasis in original) (quoting *Rho,* 113 Wn.2d at 573). "If a taxpayer assumes any liability beyond that of an agent, the payments it receives are not 'pass through' payments, even if the taxpayer uses the payments to pay costs related to the services it provided to its client." *William Rogers Co.*, 148 Wn.2d at 178 (quoting *Walthew, Warner, Keefe, Arron, Costello & Thompson v. Dep't of Revenue*, 103 Wn.2d 183, 189, 691 P.2d 559 (1984)).

2.      AMC is the Employer of the Onsite Employees

AMC argues that "[b]ased on the PMAs, the written evidence supports AMC's position that the Owners employed the on-site employees, not AMC." Br. of Appellant at 18. Thus, according to AMC, the funds used for the onsite employee payroll are the Owners' taxable receipts and should not be included in AMC's gross income. AMC identifies sections 8.1 (Manager's Authority to Hire) and 8.3 (Manager's Authority to File Returns) of the PMA as supporting its contention. The Department argues that the superior court correctly concluded that AMC was the employer of the onsite employees and the wage payments made from the operating account were part of AMC's gross income. We agree with the Department.

Here, Section 8.1 of the PMA states:

> [AMC] is authorized to hire, supervise, discharge and pay all servants, employees, contractors or other personnel necessary to be employed in the management, maintenance and operation of the Project so long as all payroll and related expenditures for such personnel are within the [business plan] guidelines. *All employees performing services directly for the Project (excluding off-site property manager) shall be deemed to be employees of [AMC] and the Project*. When requested by Owner, [AMC] shall consult with Owner in decisions relating to the hiring, promotion and termination of Project employees. *Owner or its representatives will not interfere with or direct any of [AMC's] employees*.

CP at 362 (emphasis added). Thus, *by agreement*, AMC is the employer of the onsite employees. This fact is further bolstered by the final clause of Section 8.1, which states, "Owner . . . will not interfere with or direct any of [AMC's] employees," in reference to the onsite employees previously mentioned in the provision. CP at 362. We note that in its briefing, AMC neglects to address the explicit statement that AMC is the employer of the onsite employees in its discussion of section 8.1.

15

AMC takes issue with the use of "authorize" in the first sentence in section 8.1. Br. of Appellant at 18. AMC contends that if the onsite employees were truly AMC employees, the Owners would not need to "authorize" AMC to conduct its own hiring. Br. of Appellant at 18. However, AMC confines its analysis to part of a single clause rather than the entirety of the provision. The whole sentence states that AMC is "authorized to hire, supervise, discharge and pay all . . . employees . . . to be employed in the management, maintenance and operation of the Project *so long as all payroll and related expenditures for such personnel are within the [business plan] guidelines*." CP at 362 (emphasis added). It is clear from the language of the provision that AMC may hire onsite employees so long as the labor expenses fall within a project's business plan. AMC *is not* authorized to hire onsite employees whose "payroll and related expenditures" fall outside the business plan.

Section 8.3 of the PMA states:

> [AMC] shall do and perform all acts required of an employer with respect to the Project and shall execute and file all tax and other returns required under the applicable federal, state and local laws, regulations and/or ordinances governing employment, and all other statements and reports pertaining to labor employed in connection with the Project and under any similar federal or state law now or hereafter in force. In connection with such filings, Owner shall, upon request, promptly execute and deliver to [AMC] all necessary powers of attorney, notices of appointment and the like. Owner shall be responsible for all amounts required to be paid under the foregoing laws, and [AMC] shall pay the same from the operating account.

CP at 362.

AMC argues that section 8.3 "does not require AMC to perform all acts . . . *as the employer*. Rather, it requires AMC to perform *acts of an employer*." Br. of Appellant at 19 (emphasis in original) (underlining omitted). In other words, AMC asserts that based on the language in section

16

8.3, it is not "*the*" employer.  Br. of Appellant at 19 (emphasis in original).  This is distinction without a difference.  The plain language of section 8.3 simply establishes that AMC shall file any applicable tax returns or reporting related "to labor employed in connection with the Project."  CP at 362.

Further, the PMA is not the only document that controls the relationship with the onsite employees.  Separate of the PMA, the record also shows that AMC offers comprehensive property management services, which includes "budgeting, leasing, marketing, and managing the different operational aspects" of a property.  CP at 16.  Within those services, AMC recruits, hires, and staffs the properties it manages.  These facts comport with language found in both the PMA and the AMC Employee Handbook.  Indeed, AMC describes itself as providing "full-service that includes but is not limited to hiring, supervising, discharging, and compensating workers on the [Owners'] property."  CP at 3.

AMC's marketing brochure states: "AMC is committed to hiring and retaining the right team."  CP at 216.  AMC writes onsite employee job descriptions.  AMC issues job offers to onsite employees on AMC letterhead.  The job offers list positions "for" or "at" AMC at a particular property.  CP at 474, 478.

Also, successful job applicants receive a copy of the AMC Employee Handbook, which lists in extensive detail AMC's workplace policies, employee benefits, and wage information.  The AMC Handbook is provided to all AMC employees.  AMC's employee handbook clearly demonstrates that AMC considers itself as *the* employer of onsite employees.  The handbook states: "We hope that you will take pride in your employment with us and enjoy *being a member*

*of the AMC team*." CP at 423 (emphasis added). The handbook also notes that an onsite employee's employment is contingent on the management contract between AMC and the Owners, and that if an Owner transfers property management services to another company, "an employee may be laid off or transferred to another AMC-managed property where possible." CP at 430. Therefore, if the onsite employees were truly employees of the Owners, it would not follow that they could be "laid off or transferred to another AMC-managed property" if AMC discontinued its property management services at a location.

AMC is the employer of record and withholds applicable taxes from onsite employee paychecks. Onsite employee paystubs list AMC as the sole employer. AMC dictates when employees receive their paychecks. The AMC Employee Handbook details the comprehensive medical, dental, and vision benefits and a 401(k) plan offered to full-time onsite employees. Additionally, AMC provides paid time off and vacation benefits for onsite employees, along with a sick leave policy. Thus, the record supports that employing onsite employees is part of the "business engaged in" by AMC. RCW 82.04.080(1).

Owners are not listed as a co-employer in AMC's communications with onsite employees nor is there any contract between an Owner and an onsite employee. Indeed, the PMA explicitly states: "Except as provided herein, neither party shall have the power to bind or obligate the other party." CP at 363.

Accordingly, we hold that AMC is the employer of the onsite employees. It follows then that the wages AMC pays to the onsite employees from the operating account, while separate of the management fee, constitute part of the "total money or money's worth received in the course

of doing business." *Budget Rent-A-Car*, 81 Wn.2d at 173. Therefore, the superior court did not err when it determined the wages AMC pays to onsite employees from the operating accounts constitute part of AMC's gross income. RCW 82.04.080(1).

3.  Rule 111 Does Not Apply

AMC argues that it is an agent of the Owners and it meets the conditions of Rule 111 such that the onsite employee payroll should be excluded from AMC's gross income. We disagree.

To qualify for Rule 111, AMC must meet three conditions: "1) the payments are 'customary reimbursements for advances made to procure a service for the client'; 2) the payments 'involve services that the taxpayer did not or could not render'; and 3) the taxpayer 'is not liable for paying the associate firms except as the *agent* of the client.'" *Rho*, 113 Wn.2d at 567-68 (emphasis in original) (quoting *Christensen*, 97 Wn.2d at 769). The primary inquiry is whether AMC can establish that it paid onsite employee wages solely as an agent of the Owners. *William Rogers Co.*, 148 Wn.2d at 177-78. However, if AMC is the employer, then it is liable in its own right for paying the onsite employees and Rule 111 does not apply. *Rho*, 113 Wn.2d at 569.

Here, AMC fails to establish the primary inquiry—that it is solely an agent of the Owners as it pertains to paying the onsite employees. *William Rogers Co.*, 148 Wn.2d at 177-78. As discussed above, AMC is the employer of record for the onsite employees. AMC participates in and controls all aspects of the employment relationship with onsite employees, ranging from writing job descriptions, issuing employment offer letters, hiring, supervising, and compensating onsite employees, providing employee benefits, and discharging or terminating onsite employees. *Rho*, 113 Wn.2d at 573. The AMC Employee Handbook makes clear that AMC considers itself

the employer of the onsite employees. And, as discussed above, payment of onsite employee payroll falls within AMC's "business" or its services of property management.

Further, the PMA explicitly provides that AMC is the employer of the onsite employees and disclaims a general agency relationship between AMC and the Owners. While the onsite employee wages are paid from the Owners' operating accounts, AMC—*not* the Owners—is still the party responsible for paying those wages. *William Rogers Co.*, 148 Wn.2d at 179. Section 8.2 of the PMA states: "All wages, fringe benefits, and all other forms of compensation payable to, or for the benefit of, employees of the Project . . . *shall be paid by [AMC]* from Owner's funds." CP at 362 (emphasis added). This is consistent with section 4.3 of the PMA, which also explicitly states AMC is responsible for paying the onsite employees. As previously discussed, there is no contract between the onsite employees and the Owners. Thus, based on the record, AMC cannot be said to be simply an agent of the Owners; AMC possesses more than "solely agent liability" for the onsite employee wages. *Rho*, 113 Wn.2d at 567.

Because the record shows that AMC is the employer of the onsite employees and that it is liable for onsite employee wages, AMC has failed to establish an agency relationship. Because AMC fails to establish an agency relationship, Rule 111 does not apply, and we need not address the remaining conditions. *See Rho*, 113 Wn.2d at 569. Accordingly, we hold the superior court did not err when it concluded that AMC did not pay onsite employees solely as an agent and the payroll costs were not excludable under Rule 111.

C.     IMPUTATION OF INCOME

In the alternative, AMC alleges that it never "received" the funds in the operating accounts used to pay onsite employees. Br. of Appellant at 32. AMC further argues that the only way to conclude onsite employee wages are part of AMC's gross income is to impute that income. We disagree.

Here, AMC's argument is premised on the assumption that its payment of the onsite employee wages was not part of the "value proceeding or accruing from the property management services." Br. of Appellant at 33. However, as discussed in the foregoing analysis, AMC's employment of and payment to onsite employees is part of its "business engaged in." RCW 82.04.080(1). AMC was responsible for providing comprehensive property management services which, *in AMC's own words*, includes "hiring, supervising, discharging, and compensating workers on the [Owners'] property." CP at 3. Although AMC's employees were paid from operating accounts containing funds belonging to the Owners, use of these funds to satisfy AMC's legal obligation to pay its own employees was "consideration" "actually received or accrued." RCW 82.04.090 (defining "value proceeding or accruing"). Accordingly, the onsite employee wages constitute part of the "value proceeding or accruing" from AMC's property management services, which is subject to B&O tax. RCW 82.04.080; .220. That the onsite employees' wages were paid directly from the operating accounts, and not first transferred to AMC, is of no moment. Indeed, AMC does not point to any authority suggesting—nor does RCW 82.04.080 specify— such a requirement. Thus, because the onsite employee wages are part of the value proceeding or accruing from AMC's business, AMC's argument fails.

No. 60254-7-II

AMC also argues the Department's alleged imputation of income violates due process because it amounts to compelling one taxpayer to pay tax on another taxpayer's property. For the reasons discussed above, the Department did not impute income to AMC. Because the Department did not impute income, there is no violation of due process.

CONCLUSION

We hold that the superior court did not err when it denied AMC's motion for summary judgment and granted summary judgment in favor of the Department. Accordingly, we affirm the superior court.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, P.J.

We concur:

Glasgow, J.

Che, J.

22